588 So.2d 983 (1991)
William Bryan CRUSE, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 74656.
Supreme Court of Florida.
October 24, 1991.
Rehearing Denied January 13, 1992.
*986 James B. Gibson, Public Defender and James R. Wulchak, Chief, Appellate Div., Asst. Public Defender, Seventh Judicial Circuit, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Robert J. Krauss, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
William Bryan Cruse, Jr., appeals his convictions for six counts of first-degree murder and numerous lesser offenses and the sentences of death imposed for two of the murders. We have jurisdiction under article V, section 3(b)(1) of the Florida Constitution.
On April 23, 1987, fifty-nine-year-old Cruse, having previously procured a semiautomatic assault rifle and one hundred and eighty rounds of ammunition, loaded the assault rifle, a shotgun, and a pistol into his car and began driving toward the Palm Bay Center, a shopping area. He stopped at the driveway of his neighbor, opened his car window, and fired the shotgun at John Rich, IV, a fourteen-year-old boy who was playing basketball in the driveway. Rich was struck by a single shot of birdshot. Cruse also fired at Rich's father and brother, who had pulled into the driveway just before Cruse arrived, and at Rich's mother, who had come out of the house when she heard the commotion.
Cruse then drove to the Publix grocery store at Palm Bay Center and exited his vehicle with the assault rifle, the pistol, and a backpack containing ammunition. Using the assault rifle, he shot and killed two shoppers, Nabil Al-Hameli and Emad Al-Tawakuly, who had just exited the store, and wounded their companion, Faisel Al-Mutairi. He then turned and repeatedly fired at Douglas Pollack as Pollack ran along the walkway of the shopping center. Cruse also shot Eric Messerbauer, who was in front of the K-Mart store in the center, and shot and killed Ruth Green as she pulled her car into the driveway in front of Publix. Cruse then approached his first two victims, who were lying on the ground, and shot them again.
After sirens were heard approaching, Cruse got back into his car and drove across the street to the Sabal Palm Square shopping center. He stopped at the driveway area in front of the Winn Dixie grocery store, where he again exited his vehicle and began firing shots with the assault rifle. Officer Ronald Grogan approached in his police car. Cruse turned, inserted a new clip into his rifle, and fired numerous times into the car, killing Officer Grogan.
Officer Gerald Johnson entered the parking lot just behind Officer Grogan and exited his car. Cruse shot at Johnson, wounding him in the leg. Cruse then proceeded into the parking lot, searching for Johnson, and upon finding him fired several more shots, killing him. As a rescue team tried to move Officer Grogan's car out of Cruse's line of fire, Cruse fired several shots at them.
*987 Cruse then entered the Winn Dixie store. He went to the back of the store, where people were trying to exit through a rear door, and began firing at people as they attempted to escape through a ditch that separated the center from the backyards of a neighborhood. At this time, Cruse wounded numerous people and killed Lester Watson by shooting him in the back.
Cruse then found two women, Judy Larson and Robin Brown, hiding in the women's restroom in the store. He sent Larson out to tell the police to turn off the lights in the store, keeping Brown, a Winn Dixie employee, as a hostage. Cruse attempted unsuccessfully to negotiate with the police to bring his car around back and allow him to drive out of Brevard County, where he would then allow police to kill him. Several hours later, Cruse allowed Brown to leave. The police then fired tear gas and stun grenades into the store, forcing Cruse to exit the store, where he was then apprehended. Before he was captured, Cruse had killed six people and injured ten others.
Venue for the trial was moved to Polk County. Cruse was found guilty of six counts of first-degree murder, twenty-two counts of attempted first-degree murder, two counts of attempted second-degree murder, one count of false imprisonment, and one count of kidnapping. The jury recommended death on all six counts of first-degree murder. The trial court imposed the death penalty for the murders of Officers Grogan and Johnson but imposed consecutive life sentences for the other four murders.
Cruse's first claim on this appeal is that a new trial is necessary because of the State's failure to disclose psychiatric evidence, in violation of Cruse's due process rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). On the record before the Court, we find this claim to be without merit.[1]
Prior to trial, the defense filed a motion for the production of Brady evidence and a motion for an in camera hearing, seeking any favorable psychiatric evidence which the State possessed. At the in camera hearing, the State disclosed the names of two mental health experts, Dr. Miller and Dr. Wilder, who had been consulted but would not be testifying at trial. Neither expert had prepared a written report, interviewed Cruse, or formulated a specific opinion about Cruse's sanity. The trial judge determined that the names of these experts were not Brady material and would not have to be disclosed to the defense.
Not all evidence in the possession of the State must be disclosed to the defense under Brady. Evidence is only required to be disclosed if it is material and exculpatory. Evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383-84, 87 L.Ed.2d 481 (1985). In making this determination, the evidence must be considered in the context of the entire record. United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401-02, 49 L.Ed.2d 342 (1976).
The State's failure to disclose the names of Dr. Wilder and Dr. Miller does not meet this standard. There is no indication in the record that these experts expressed any opinions or possessed any data which could have been favorable to the defense. From the statements made at the in camera hearing, it appears that Dr. Wilder would have ultimately testified in favor of the State's position. While the preliminary position of Dr. Miller is more questionable, even his most defense-oriented *988 statements[2] were at best mere restatements of the opinions expressed by the experts who actually testified at trial. In addition, the State indicated that Dr. Miller was ultimately leaning toward a finding that Cruse was sane.
It appears that the most favorable opinion the defense could have been able to acquire from the undisclosed experts is that Cruse suffered from delusional thinking. This would have been merely cumulative in light of the tremendous amount of expert testimony at trial, including the testimony of State witnesses. In light of the record presently before the Court, we find that no Brady violation has occurred.
Cruse next claims that the trial court erred by failing to allow cross-examination of a State expert, Dr. Kirkland, as to his examination of a criminal defendant in a different capital case. In State v. Sireci, 536 So.2d 231 (Fla. 1988), this Court upheld a finding by the trial court that Dr. Kirkland had rendered an incompetent medical evaluation. We held that there was sufficient evidence in the record to support the trial court's finding that Dr. Kirkland should have discovered that Sireci's medical history included a major car accident and two-week coma at the age of sixteen, as well as the existence of partial facial paralysis, and therefore should have ordered additional testing to determine the existence of organic brain damage. Id. at 233.
The appropriate subjects of inquiry and the extent of cross-examination are within the sound discretion of the trial court. Rose v. State, 472 So.2d 1155, 1158 (Fla. 1985), citing Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). In this case, the trial court determined that the competency of Dr. Kirkland's evaluation of Sireci was a purely collateral matter, the probative value of which was outweighed by the danger of confusing the issues and misleading the jury.
This ruling by the trial judge was clearly not an abuse of discretion. The defense's proposed evidence does not fall under any of the express ways allowed to attack a witness's credibility  it does not deal with a prior inconsistent statement, bias, character or ability to observe, remember, or recount. See § 90.608, Fla. Stat. (1987). Cruse was attempting to introduce evidence of an arguably inadequate evaluation[3] by an expert over ten years before he ever conducted an evaluation in this case. If this were permitted, the State could then have introduced evidence that the Sireci evaluation was not inadequate and may even have gone on to introduce evidence of prior competent evaluations performed by Kirkland. If such inquiry were permissible, every trial involving expert testimony could quickly turn into a battle over the merits of prior opinions by those experts in previous cases, malpractice suits filed against them, and Department of Professional Regulation allegations.
The adequacy of Dr. Kirkland's evaluation of a criminal defendant over ten years earlier was not a relevant issue for the jury's consideration. The trial judge properly found that Dr. Kirkland was qualified to testify as an expert, and the court did not in any way attempt to limit defense examination of the merits of the evaluation of Cruse himself or of the doctor's overall qualifications as an expert in the fields of psychiatry and forensic psychiatry. While a defendant is generally accorded wide latitude in the cross-examination of State experts, a trial court is not required to permit inquiry of the sort requested by the defense in this case. Cf. Rose, 472 So.2d at 1158 (attacking the professionalism of a *989 detective is an improper means of attacking credibility).
As his next point on appeal, Cruse argues that the trial judge gave an inappropriate insanity instruction. In addition to the standard instruction on insanity,[4] the judge also instructed the jury as follows:
A person may be legally sane in accordance with the instructions previously given and still yet, by reason of mental infirmity, have hallucinations or delusions which cause him to honestly believe to be facts things which are not true or real. The guilt of a person suffering from such hallucinations or delusions is to be determined just as though the hallucinations or delusions were actual facts. If the act of the defendant would have been lawful had the hallucinations or delusions been the actual facts, the defendant is not guilty of the crime.
This instruction is very similar to what used to be a standard jury instruction, Florida Standard Jury Instruction (Criminal) 2.11(b)-2 (1980), but has since been dropped. The instruction has never been expressly approved or disapproved by this Court.
A trial judge in a criminal case is not required to give solely those instructions that are contained in the Florida Standard Jury Instructions. The standard instructions are "a guideline to be modified or amplified depending upon the facts of each case." Yohn v. State, 476 So.2d 123, 127 (Fla. 1985).
The delusions instruction is relevant to the facts of this case. Cruse's delusions were an integral part of the defense case. Each expert witness testified as to Cruse's delusions of people talking about him and attempting to test his sexuality and to turn him into a homosexual.
Cruse argues that the delusions instruction had a tendency to mislead the jury. However, a careful reading of the instruction shows that the jury was to focus on the delusions as a means of finding insanity only after determining that Cruse was sane under the standard insanity instruction incorporating the M'Naghten test. The additional instruction given by the trial court was actually a second way that Cruse could have been found insane, and it was, therefore, to Cruse's advantage to have the instruction given. We find no error in giving this instruction.
As his next point on appeal, Cruse argues that the trial court erred by not allowing him to present surrebuttal evidence. In rebuttal, the State presented evidence that Cruse's actions were a result of extreme anger, that his delusions did not involve a fear of physical harm, and that his hallucinations were the result of a "jail psychosis," as there was no evidence of hallucinations prior to his incarceration. Cruse argues that he had a right to rebut this evidence.
In its case-in-chief, the defense presented lengthy expert testimony that Cruse suffered from a serious mental illness. Each of the experts was questioned about the presence of hallucinations, sensory perceptions of things which are not there, and delusions, false beliefs not founded in reality. All the experts, including the State's experts, agreed that Cruse definitely suffers from delusions. However, the testimony regarding hallucinations was less certain. Defense experts opined that Cruse may have had hallucinations in the past, although they could not conclusively say that he had. Evidence of recent instances of hallucinations, while Cruse was incarcerated, was also presented through expert testimony.
Dr. Berland, the expert who was offered by the defense in surrebuttal, would have testified about specific instances of definite hallucinations in Cruse's past. While this may have proved helpful to the defense, there is no reason that this testimony was not offered in its case-in-chief. Direct examination of other defense experts indicated that this was an important issue from the defense's perspective and was not *990 brought into the case for the first time in the State's rebuttal.
Furthermore, the defense had deposed both State experts before trial, and their testimony did not stray from the opinions given in their depositions. Both experts specifically discussed hallucinations in their depositions. Even Dr. Cavanaugh's conclusion that Cruse's current hallucinations were merely the result of a "jail psychosis" was expressly presented in his deposition. Therefore, there is no danger that the defense was caught by surprise by the testimony of the State's experts.
Dr. Berland also would have testified that any anger felt by Cruse would not have been of the same type as that felt by nonpsychotic people. While this testimony would have been relevant, again there is no reason that the defense did not present it in its case-in-chief. From the time of the State's opening argument to the cross-examination of defense experts, it was apparent that the State was relying on anger as the defendant's motivation for his conduct that day. In addition, both experts specifically discussed anger in their pretrial depositions taken by the defense.
The same is also true of Dr. Berland's proffered testimony that Cruse's delusions related to a fear of physical attack. Again, this testimony should have been presented as a part of the defense's case-in-chief. The State experts said nothing new about the scope of Cruse's delusions, but merely took the extra step of noting that they had nothing to do with a fear of attack. In addition, in Dr. Kirkland's deposition he specifically stated that Cruse did not believe himself to be in a life-threatening situation.
The defense was aware that Dr. Kirkland and Dr. Cavanaugh would be testifying on behalf of the State at trial, and both doctors were deposed by the defense before trial. As the trial court ruled, the proposed testimony was not true surrebuttal. All issues raised by the State in rebuttal had been testified to in great detail by the defense experts, as well as by the State's experts at their previous depositions.
The decision to allow or disallow surrebuttal evidence rests within the sound discretion of the trial judge. See Williams v. State, 487 So.2d 94 (Fla. 3d DCA 1986); Gandy v. State, 440 So.2d 432, 433 (Fla. 1st DCA 1983). We find no abuse of discretion in this case.
As his fifth point on appeal, Cruse argues that the trial court erred by refusing to allow lay opinion testimony about Cruse's sanity. This argument involves the testimony of two witnesses, Gregory Bowden, a police officer, and Ellen Rich, a neighbor.
The defense sought to elicit testimony from Officer Bowden concerning Cruse's apparent sanity on April 18, 1987, five days before the shootings at the shopping centers. Officer Bowden was investigating an incident in which Cruse yelled obscene words and made obscene gestures in front of some neighborhood children. The court allowed the officer to describe his observations with regard to Cruse's demeanor and actions but did not allow him to express an opinion about Cruse's mental condition or dangerousness.
Lay opinion testimony as to a person's sanity is permissible, as long as the witness is testifying on the basis of personal knowledge or observations. However, the testimony must be based on observation and knowledge gained "in a time period reasonably proximate to the events giving rise to the prosecution." Garron v. State, 528 So.2d 353, 357 (Fla. 1988). Officer Bowden's contact with Cruse took place almost a week before the shootings. "A nonexpert is not competent to give lay opinion testimony based on his personal observation that took place a day removed from the events giving rise to the prosecution." Id. The exclusion of this testimony was proper.
The defense also sought to elicit testimony from Cruse's neighbor, Ellen Rich, as to her opinion of Cruse's mental condition. This opinion testimony should have been permitted. Mrs. Rich had lived across the street from Cruse for nine months and testified to several encounters with him. Witnesses who "have known *991 and observed a defendant over an extended period of time may ... testify as to their nonexpert opinion on the defendant's sanity." Id. at 357 n. 3.
Mrs. Rich was allowed to testify about numerous instances of strange behavior by Cruse and was allowed to testify that she told Cruse that he belonged "in a rubber room." The only thing she was not permitted to say was that she thought Cruse was "acting crazy." We find that the exclusion of this testimony was harmless error.
As his sixth point on appeal, Cruse argues that the trial court erred by allowing testimony concerning Cruse's lack of remorse over his male victims. Evidence of lack of remorse is generally irrelevant and, therefore, inadmissible. However, we find no error in the admission of the testimony in this case because it was relevant to rebut testimony elicited by the defense in its examination of the same witness.
On redirect examination of Dr. Rappeport, a defense expert witness, the defense elicited testimony as to Cruse's reverent attitude toward women. According to the defense, this attitude was inconsistent with the fact that women were injured in the shootings, demonstrating that Cruse was unaware of the consequences of his actions. On recross, the State expanded on this testimony by asking about Cruse's remorse about the fact that he had shot women. The State then elicited testimony that Cruse had not shown remorse about the men that he shot, indicating, under the State's theory, that the shooting was a conscious result of Cruse's overall anger toward men. Having raised the issue itself on redirect, the defense cannot now complain that the State expounded on Cruse's attitude toward his victims.
In points seven and eight, Cruse argues that inappropriate comments by the prosecutor at the guilt and penalty phases of the trial resulted in sufficient cumulative error to mandate a new trial and/or sentencing proceeding. We summarily reject these claims.
Cruse's final arguments relate to the trial judge's findings at the sentencing phase of trial. In its advisory verdict, the jury recommended that Cruse be sentenced to death on all six counts of first-degree murder.[5] The court imposed the death penalty only for the murders of Officers Grogan and Johnson. The court found the following as aggravating circumstances: (1) Cruse had previously been convicted of violent felonies (the contemporaneous convictions); (2) Cruse's actions presented a great risk of death to many persons; (3) the murders were cold, calculated, and premeditated; and (4) the murders were committed to prevent lawful arrest.[6] In mitigation the judge found extreme mental or emotional disturbance, to which he gave great weight.
Cruse claims that the trial court erred in finding the murders to have been committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. § 921.141(5)(i), Fla. Stat. (1987). We find that the trial court was correct in finding this aggravating circumstance to have been established beyond a reasonable doubt as to both murders.
This Court has defined cold, calculated, and premeditated as "a careful plan or prearranged design to kill." Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). Ample evidence in the record supports a finding that these murders were committed with the heightened premeditation necessary to support a finding of this aggravating factor.
On March 21, 1987, Cruse specially ordered a high-velocity semiautomatic assault rifle, with the capability of firing shots as fast as the trigger can be pulled. On April 17, 1987, after a run-in with neighborhood children, he purchased an additional one hundred rounds of ammunition for the rifle. *992 He also purchased six thirty-round clips, after being told that forty-round clips would be likely to cause the rifle to malfunction. Six days later, on April 23, Cruse loaded his car with a shotgun, a pistol, the assault rifle, and one hundred and eighty rounds of ammunition and proceeded to the Palm Bay Center.
In addition to the advance procurement of the rifle and large quantities of ammunition and clips, further evidence of heightened premeditation is found in the circumstances of each murder. Officer Grogan was killed as he approached the Winn Dixie store. Cruse turned his attention away from the interior of the store, inserted a fresh thirty-round clip into the assault rifle, raised the rifle, aimed at Grogan's car, and shot eight rounds into the windshield. In addition, as rescue attempts were underway, Cruse expressed his intent by stating, "Where is the cop. Get away from the cop. I want the cop to die." Officer Johnson arrived at the store shortly after Officer Grogan. After being shot in the leg, Johnson attempted to find cover by going behind a car. Cruse pursued him into the parking lot and fired three more shots into his body.
Finally, it is noteworthy that both of the murders for which Cruse was sentenced to die took place at the second site of shootings. By this time, Cruse had heard sirens approaching, reentered his car, and driven to another shopping center. This provided ample time for reflection. As the trial judge noted, by the time Cruse arrived at the Winn Dixie center "his premeditation was heightened to the extreme."
Cruse contends that he committed these acts in a deranged fit of rage. This type of mind-set is inconsistent with premeditated intent, unless there is other evidence to prove heightened premeditation beyond a reasonable doubt. Thompson v. State, 565 So.2d 1311, 1318 (Fla. 1990). The substantial additional evidence of heightened premeditation, discussed above, shows that this aggravating factor is present. In addition, Cruse's contention is controverted by the testimony of various witnesses. Throughout the shooting episodes, witnesses described Cruse's manner as being very calm and controlled, as if he were merely accomplishing a task. This evidence is inconsistent with the type of sudden rage discussed in other cases as negating the element of heightened premeditation. See, e.g., Thompson, 565 So.2d at 1318; Garron v. State, 528 So.2d 353 (Fla. 1988); Mitchell v. State, 527 So.2d 179 (Fla.), cert. denied, 488 U.S. 960, 109 S.Ct. 404, 102 L.Ed.2d 392 (1988).
The advance procurement of a weapon and vast amounts of ammunition, the reloading, the lack of resistance or provocation, and the appearance of a killing carried out as a matter of course are all indications of the existence of this aggravating factor. Swafford v. State, 533 So.2d 270, 277 (Fla. 1988), cert. denied, 489 U.S. 1100, 109 S.Ct. 1578, 103 L.Ed.2d 944 (1989).
The trial court was also correct in finding a lack of any pretense of moral or legal justification. This Court has defined a pretense of justification as "any claim of justification or excuse that, though insufficient to reduce the degree of homicide, nevertheless rebuts the otherwise cold and calculating nature of the homicide." Banda v. State, 536 So.2d 221, 225 (Fla. 1988), cert. denied, 489 U.S. 1087, 109 S.Ct. 1548, 103 L.Ed.2d 852 (1989). Cruse's delusions that people were talking about him or attempting to turn him into a homosexual do not provide a colorable claim of any kind of moral or legal justification for his lashing out against the community.
Cruse argues that he felt compelled to protect himself from the threat of bodily harm by the community to himself and his wife. However, five out of the six experts who testified indicated that Cruse's paranoid delusions related to a fear for his sexuality, not a fear of any physical harm. The one expert who did testify to this type of fear indicated that he only learned of this delusion upon examining Cruse in March of 1989, during the course of the trial. The overwhelming weight of the evidence supports the trial court's finding.
*993 Cruse also argues that the trial court erred in finding the murders were committed for the purpose of avoiding or preventing a lawful arrest. § 921.141(5)(e), Fla. Stat. (1987). We find that the trial court properly found sufficient evidence to establish the existence of this aggravating circumstance beyond a reasonable doubt.
Cruse specifically turned away from the Winn Dixie store when Officer Grogan approached. He reloaded his weapon and fired eight shots into the marked patrol car. He also fired shots at rescuers attempting to remove Officer Grogan from his line of fire. Cruse's intent is further evidenced by his statements to rescuers to "get away from the cop. I want the cop to die."
Cruse also paid particular care to ensure the death of Officer Johnson, walking out into the parking lot to find the officer and shoot him after wounding him in the leg. Johnson had also approached in a marked police car and was wearing a police officer's uniform. These killings do not appear to be merely more random shootings, as Cruse argues. Cruse focused specific attention and care in assuring that these officers did not survive.
These actions took place after Cruse had left the Publix shopping center when sirens were heard approaching. There is little doubt that the police officers approached the Winn Dixie with the intent to arrest Cruse and prevent him from shooting any people at this center. Cruse would have us place great weight on the fact that he did not leave the scene after killing the police officers, thereby effectuating an escape. However, this fact is not dispositive, especially in light of the subsequent events in which Cruse proceeded into the Winn Dixie store and shot more people. The fact that Cruse did not use this opportunity to flee the scene does not mean that his motivation was not to avoid arrest. He was successful in avoiding arrest and carrying on with what he evidently intended to do at the Winn Dixie store  kill more people.
We find the remainder of Cruse's claims relating to the imposition of the death sentences to be without merit.[7]
For the reasons expressed, we affirm Cruse's convictions and sentences of death.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
BARKETT, J., dissents with an opinion.
BARKETT, Justice, dissenting.
The Supreme Court in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). I believe the State's refusal to divulge information that it knew would strengthen the defense's case meets these requirements.
In this case, the State refused to supply the defense the names of two mental health experts to whom it had furnished information and evidence of the case, including the defendant's videotaped statement to the police, witness reports, and reports of other psychiatrists, because "there might possibly be something that they could learn." The majority contends that "[t]here is no indication in the record that these experts expressed any opinions or possessed any data which could have been favorable to the defense." Majority *994 op. at 987. However, while the prosecutor tried to downplay the importance of these experts at the in camera hearing, a fair reading of the transcript reveals that both experts had expressed to the State a belief that Cruse was mentally impaired. In fact, the prosecution had originally contacted Dr. Miller to be a witness to rebut the defense of insanity, but dismissed him because he "did not want to provide more fuel to the Defense." As to Dr. Wilder, the prosecutor admitted that "Dr. Wilder has opined, to give you a synopsis, that [Cruse] has a mental illness which is difficult to categorize, some different divisions and perhaps schizophrenia."
The majority finds no error here, contending that those opinions would have been "merely cumulative in light of the tremendous amount of expert testimony at trial." Majority op. at 6. I believe the majority underestimates the value to the defense of using the State's own experts to support the defense's position. Moreover, I do not believe that the fact that other experts at trial expressed the same opinion is a pertinent part of the inquiry of whether or not a Brady violation occurred. Rather, the inquiry should focus on whether the State withheld any evidence favorable to the defense. Clearly in this case, the State did. I would reverse the convictions and remand for a new trial.
I am also compelled to dissent as to the propriety of the death sentence in this case. First, I cannot agree that the aggravating circumstance of cold, calculated, and premeditated murder is appropriate here. The fact that Cruse procured the weapon in advance and drove to the shopping center certainly evinces premeditation in support of guilt. However, the evidence pertaining to Cruse's state of mind, at the very least, undermines any finding beyond a reasonable doubt that the heightened cold, calculated, and premeditated circumstance applies.
First, I find the facts of this crime support Cruse's contention that he acted out of intense, albeit unwarranted, anger prompted by his delusional state. Such an emotional state prevented the formulation of a plan through cool and calm reflection. Cruse's behavior was a wild and irrational reaction of a man suffering severe mental disturbance, not the product of "cold" deliberation. Cf. Santos v. State, No. 74,467, 1991 WL 188306 (Fla. Sept. 26, 1991) (factor not proven where murder arose out of a highly emotional domestic dispute).
Furthermore, the factor of cold, calculated, and premeditated murder requires more than just heightened premeditation; it also requires the exclusion of any "pretense of moral or legal justification." § 921.141(5)(i), Fla. Stat. (1987). In this case, the evidence shows that Cruse was acting in response to his delusions that people were trying to harm him. In his demented mind, Cruse had a valid reason for his actions. As this Court explained in Banda v. State, 536 So.2d 221, 225 (Fla. 1988), cert. denied, 489 U.S. 1087, 109 S.Ct. 1548, 103 L.Ed.2d 852 (1989), "under the capital sentencing law of Florida, a `pretense of justification' is any claim of justification or excuse that, though insufficient to reduce the degree of homicide, nevertheless rebuts the otherwise cold and calculating nature of the homicide." (Emphasis added.) While Cruse's delusional beliefs do not assuage his guilt, they do demonstrate that in his mind he had at least a pretense of moral or legal justification.
Moreover, I do not believe the death penalty was intended for a defendant so obviously mentally disturbed. Even the State's experts testified to Cruse's delusional problems. This Court has recognized that a sentence of death is disproportionate where the defendant suffers extreme mental illness, notwithstanding the existence of valid aggravating circumstances. See, e.g., Klokoc v. State, No. 74,146 (Fla. Sept. 5, 1991); Fitzpatrick v. State, 527 So.2d 809 (Fla. 1988). I would find the death sentences in this case disproportionate and instead impose life sentences.
NOTES
[1] We also reject Cruse's contention that the trial judge failed to conduct an adequate inquiry into the precise nature of the information withheld by the State. The judge in this case conducted an extensive in camera hearing, which included asking a series of questions prepared by the defense before the hearing. Cf. Robinson v. State, 522 So.2d 869, 871 (Fla. 2d DCA 1987) ("cursory review" of alleged Brady violation insufficient).
[2] Dr. Miller had indicated that he believed Mr. Cruse had a delusional system but probably would not have acted it out if not for the volitional use of alcohol.
[3] In State v. Sireci, 536 So.2d 231 (Fla. 1988), this Court acknowledged that there was evidence in the record to support the conclusion that Dr. Kirkland's examination was adequate but allowed the trial court's decision to stand under the basic principle that an appellate court should not substitute its judgment for that of the trial court where there is competent substantial evidence to support the trial court's findings. Id. at 233.
[4] A person is considered to be insane when: (1) he had a mental infirmity, disease, or defect; (2) because of this condition (a) he did not know what he was doing or its consequences, or (b) although he knew what he was doing and its consequences, he did not know it was wrong.
[5] Count 1 (Nabil Al-Hameli) by a vote of 11-1; Count 2 (Emad Al-Tawakuly) by a vote of 11-1; Count 3 (Ruth Green) by a vote of 10-2; Count 4 (Ronald Grogan) by a vote of 11-1; Count 5 (Gerald Johnson) by a vote of 12-0; and Count 6 (Lester Watson) by a vote of 11-1.
[6] § 921.141(5)(b), (c), (i), (e), Fla. Stat. (1987).
[7] Cruse argues (1) the aggravating circumstance of cold, calculated, and premeditated is unconstitutionally vague and overbroad; (2) the trial court failed to consider and give proper weight to relevant statutory and nonstatutory mitigating factors; (3) the death sentences in this case are disproportionate when compared with other capital sentencing decisions; and (4) the Florida death-sentencing statute is unconstitutional on its face and as applied.