766 So.2d 364 (2000)
Jeffrey Wade WALLACE, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D98-3069.
District Court of Appeal of Florida, Third District.
July 26, 2000.
Rehearing Denied September 13, 2000.
*365 Bennett H. Brummer, Public Defender and Howard K. Blumberg, Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General and Frank J. Ingrassia, Assistant Attorney General, for appellee.
Before GODERICH, GREEN, and SORONDO, JJ.
GREEN, J.
The appellant, Jeffrey Wade Wallace, appeals his convictions and sentences for one count of first degree murder and four counts of attempted first degree murder. *366 Based on the reasons which follow, we affirm in all respects.
On April 7, 1997, in the late evening hours, Wallace was at the Hideaway Bar at the Rum Runners complex in Key West. During Spring Break of 1996, Wallace had worked at the Hideaway Bar but was fired by the bar's manager, Brian Sawyer. Sawyer had rehired Wallace to work exclusively during Spring Break of 1997. Wallace's employment ended in March 1997. On the night in question, Wallace was seated at Rum Runners bar. He sat next to Danny Leon. Wallace, citing a prior encounter that he had with Leon, tried to provoke a fight with Leon. The bartender told Leon and Wallace to calm down and they did. The bartender gave Wallace a shot of whiskey. Wallace accused the bartender of watering down the drink. The bartender called Wallace an "ah" and threw the drink into the trash. Thereafter, Wallace exited the bar.
Later that same evening, Wallace returned to the bar. He had changed his clothes and was now wearing all black clothing. Leon approached Wallace. Wallace pulled out a gun and began shooting in the direction of the bar and away from Leon. The shots struck the bar's general manager in the shoulder and in the chest; he later died from these wounds. One of the shots grazed Sawyer on the side of the temple. The bartender was shot twice in the chest and once in the back. An off-duty bartender was shot once in the neck and once in the arm. Finally, a bystander who had just entered the bar and joined a crowd when the shooting began, was struck once in the shoulder.
A bar patron and an off-duty employee subdued Wallace until the police arrived. Prior to the arrival of the police, however, Wallace threatened to kill all of the bar's patrons and employees. Upon the police officers' arrival, Wallace was arrested and transported to a hospital for treatment of his injuries. While Wallace was being transported to the hospital, he told an officer that he was not delusional, that if he could have done more damage at the bar he would have, and that he was glad about the shooting. Wallace also told the officer that he would finish the job once he was released from jail. Wallace said that he had specific targets at the bar and that the people there were evil and Satanists. While at the hospital, Wallace told another officer that he hoped that he got all of them. He also stated that he shot the victims because they were evil. Wallace confessed that he had planned the incident for a year.
After Wallace was treated at the hospital, he was transported to the Key West Police Department where he gave an audio taped confession. The confession was elicited roughly one hour after the shooting incident. Wallace told the interrogating officer that the bar's staff was evil and that they had been "messing" with him. Wallace stated that he warned the staff that if they "messed" with him, he would hurt them. He also admitted that the murder was premeditated. Wallace maintained that he did not intend to hurt the bystander who was injured. Wallace stated that Rum Runners was filled with gambling, prostitution and Mafia influences and that it was evil because of the crimes being committed there.
Wallace added that he had purchased a black suit and a $200 pair of shoes as part of his planning process to rid the bar of its evil. He also had purchased the gun that was used in the shooting one year earlier. Wallace stated that he had waited one year in an effort to give the bar's employees a chance for redemption. He wanted an apology from the bar's staff and wanted them all to treat him decently.
While at the jail, awaiting trial, Wallace told an employee that if the people in the bar had not stopped him, he would have killed about 20 more people because he had 100 rounds of ammunition. Wallace added that the bar was a Mafia base and that drug deals, gambling and prostitution was happening at the bar.
*367 Wallace was charged with one count of first degree murder and four counts of attempted first degree murder. Wallace proceeded to trial by a jury. Wallace's defense at trial was that of insanity under the M'Naghten Rule as well as insanity by reason of delusions or hallucinations. Wallace was found guilty as charged and he now appeals.
On this appeal, Wallace cites three grounds for reversal. First, he asserts that the trial court repeatedly erred by permitting the state to elicit irrelevant, inappropriate, and misleading testimony pertaining to his insanity defenses. Secondly, Wallace maintains that the lower court erred by excluding his testimony, on hearsay grounds, regarding statements that were made to him by others prior to the shooting. Wallace maintains that such statements were relevant to prove his state of mind at the time of the shootings and therefore, were not hearsay. Finally, Wallace argues that his conviction for attempted first degree murder of the bystander must be reduced to attempted second degree murder where the evidence established that this shooting was accidental and that he did not have the requisite intent for attempted first degree murder.[1]

I. The Insanity Issue
Wallace's defense in this case was insanity both under the M'Naghten Rule and insanity by reason of hallucinations or delusions. He first argues on this appeal that he is entitled to a new trial because the trial court made various erroneous evidentiary rulings which allowed the prosecutor to improperly mislead the jury about the insanity defense by interjecting the law of self-defense into the parameters of the hallucination instruction. Wallace essentially argues that a defendant is not guilty by reason of insanity if, under the influence of delusions caused by his mental disease, he "truly believed" that other people were going to kill him and he "truly believed" that he had to kill those other people in self-defense.
In a criminal prosecution in Florida, a person is presumed sane and the burden rests with the defendant to present evidence of insanity. See Hall v. State, 568 So.2d 882, 885 (Fla.1990).[2]See also Preston v. State, 444 So.2d 939, 944 (Fla. 1984) vacated on other grounds, 564 So.2d 120 (Fla.1990). The appellant in this case relied upon the defense of insanity under both the M'Naghten Rule and the hallucination theory of insanity. Since, as the state correctly asserts, each of these theories has somewhat different standards, it is necessary for us to separately address the law and assess the evidence as to each.

A M'Naghten Rule
The legal test for insanity in Florida criminal cases has long been the "M'Naghten Rule." See Cannady v. State, 620 So.2d 165, 168 n. 1 (Fla.1993); Hall v. State, 568 So.2d at 885; Anderson v. State, 276 So.2d 17, 18 (Fla.1973); Piccott v. State, 116 So.2d 626, 627 (Fla.1959); Davis v. State, 44 Fla. 32, 32 So. 822, 826 (1902). Under that rule, an accused is not criminally responsible if, at the time of the alleged crime, the defendant, by reason of a mental disease or defect, (1) does not know of the nature or consequences of his or her act; or (2) is unable to distinguish right from wrong. See Gurganus v. State, 451 So.2d 817, 820 (Fla.1984); Wheeler v. State, 344 So.2d 244, 245 (Fla.1977). The "wrong" under M'Naghten, however, is measured by societal standards and not any subjective moral standards set forth by the defendant. See Aguilera v. State, 606 So.2d 1194 (Fla. 1st DCA 1992); Hansen v. State, 585 So.2d 1056 (Fla. 1st DCA *368 1991); see also Hill v. State, 688 So.2d 901 (1996); Dougan v. State, 595 So.2d 1 (Fla. 1992). Thus, under M'Naghten, if a defendant suffers from some mental infirmity, defect, or disease, but nevertheless understands the nature and consequences of his actions and that his actions are against the law, his actions are punishable.

B. Hallucinatory Theory
It appears that the hallucinatory theory of insanity was initially recognized in Florida in Cruse v. State, 588 So.2d 983 (Fla. 1991). In that case, the Florida Supreme Court found no error in the following jury instruction given on insanity by reason of hallucinations or delusions:
A person may be legally sane in accordance with the instructions previously given and still yet, by reason of mental infirmity, have hallucinations or delusions which cause him to honestly believe to be facts things which are not true or real. The guilt of a person suffering from such hallucinations or delusions is to be determined just as though the hallucinations or delusions were actual facts. If the act of the defendant would have been lawful had the hallucinations or delusions been the actual facts, the defendant is not guilty of the crime.
Id. at 989. See also Boswell v. State, 610 So.2d 670, 673 (Fla. 4th DCA 1992). The court in Cruse, noted that this instruction was to focus on the delusions as a means of finding insanity only after determining that the defendant was sane under the standard insanity instruction incorporating the M'Naghten test. Cruse, 588 So.2d at 989. In other words, this additional instruction was actually a second way by which the defendant could be found insane. Id.
In 1997, the instruction approved of in Cruse, was formally incorporated into the Standard Jury Instructions in Standard Jury Instructions in Criminal Cases, 697 So.2d 84, 95 (Fla.1997), and reads as follows:
An issue in this case is whether (defendant) was insane when the crime allegedly was committed.
A person is considered to be insane when:
1. The person had a mental infirmity, disease, or defect.
2. Because of this condition, the person had hallucinations or delusions which caused the person to honestly believe to be facts things which are not true or real.
The guilt or innocence of a person suffering from such hallucinations or delusions is to be determined just as though the hallucinations or delusions were actual facts. If the act of the person would have been lawful had the hallucinations or delusions been the actual facts, the person is not guilty of the crime.
Id.
Based upon this instruction, which was given in the instant case, the defendant's hallucinations or delusions are to be accepted as true. Thus, if Wallace's acts would have been lawful had his hallucinations or delusions been true, he may not be held criminally accountable for the offenses. Id.

C. Evidence
Based upon these two theories of insanity, we now need to examine the evidence adduced below. In support of his insanity defense, Wallace presented the testimony of Dr. Guillermo Marcovici, a licensed psychiatrist and Dr. Thomas Hibberd, a licensed clinical psychologist, who both opined at trial that he was legally insane at the time of the shootings. Wallace also presented the testimony of family members and his own testimony in support of his defense.
During pretrial depositions, Dr. Marcovici testified that Wallace was insane under M'Naghten because he had lost the ability to differentiate between right and wrong and that Wallace believed that it was acceptable *369 to shoot evil people. Dr. Marcovici also testified that in his opinion, moral insanity satisfied the "wrong" as utilized in M'Naghten. He also testified that his opinion as to Wallace's insanity was based solely upon M'Naghten. Finally, Dr. Marcovici testified, hypothetically, that assuming all of Wallace's delusions about the bar to be true, Wallace would not have been justified in using deadly force and that Wallace would therefore have to be reevaluated within the context of the hallucination instruction.
At trial, Dr. Marcovici opined that Wallace suffered from a delusional disorder, of the persecutorial type, but that Wallace understood the consequences of his actions at the time of the shooting. However, the doctor concluded that Wallace did not know, as a result of his delusional disorder, that what he was doing was wrong.
On cross-examination, the state elicited, without objection, the following concessions from Dr. Marcovici: (1) that Wallace did not perceive that anyone was going to inflict deadly force upon him when he commenced shooting; (2) that during his pretrial deposition, he had testified that Wallace was not justified in using deadly force at the bar; and (3) that Wallace knew that it was illegal to kill people in general, except in self-defense. Dr. Marcovici nevertheless testified, based upon his knowledge of the law on self-defense, that Wallace was justified in utilizing deadly force under the delusion that his life was in danger.
Dr. Hibberd likewise opined at trial that Wallace was suffering from a persecutorial delusional disorder which caused Wallace's thinking and behavior to be influenced by false beliefs to which he fixedly held despite all evidence to the contrary. Dr. Hibberd also testified that Wallace met both prongs of the test for insanity by reason of hallucinations or delusions in that his delusions caused him to honestly believe facts that were not true or real.
During cross-examination, the state, over defense objections, sought to question Dr. Hibberd as to his knowledge of the law of self-defense. The defense argued that this line of questioning misled the jury as to the requirements of the defense of insanity by reason of hallucinations or delusions. Defense counsel argued that the jury was not to decide whether Wallace's actions met the legal requirements of self-defense, but whether Wallace, as a result of hallucinations or delusions, believed his actions were necessary to protect himself.
The trial court overruled the defense's objection and the state was able to impeach Dr. Hibberd by showing his lack of knowledge on the law of self-defense. Dr. Hibberd also conceded that Wallace knew that murder was illegal and might have been aware that his conduct was wrong.
Wallace's mother, Roxanne Wallace, testified that her son became paranoid in 1994. While living with her in Memphis, Wallace told his mother that people were telling lies about him. Wallace even accused his mother of being a part of a group of people who were out to get him. Thus, at his mother's insistence, Wallace checked himself into a psychiatric hospital. He remained there for six weeks. Ms. Wallace testified that after Wallace was released from the hospital he traveled to California and Mississippi and upon his return to Memphis, she noticed that his mental condition had deteriorated to the point that he was acting in a bizarre fashion. As a result, Ms. Wallace insisted that Wallace receive mental treatment at a local mental health center. Wallace visited the center and he was prescribed antidepressant medication. However, Wallace did not take the medication because he felt that other people would be in control of his life and he would be stigmatized as being mentally ill.
Robbie Swope, Wallace's aunt, testified that she noticed that Wallace's mental state began to change in 1994. She testified that Wallace told her that there was evil in Florida and that something should be done about the people in South Florida. *370 After the shooting, Wallace told Swope that he had shot the people because they had treated him badly.
Wallace testified that he has a bachelor's degree in psychology and has completed one semester of graduate studies in a psychology doctorate program. While a graduate student, Wallace worked as a "psych tech" at a private psychiatric hospital. After a semester in graduate school, he and his wife were divorced and he worked as a stock broker. During this point in Wallace's life, "things started kind of unraveling."
In 1994, Wallace moved to Key West and began working at Rum Runners. He ceased working at the bar and returned to Memphis to live with his mother. Later in 1994, he moved to California to live with his aunt. While living with his aunt, he informed her that Rum Runners was operated by the Mafia and a Satanic cult. In early 1995, Wallace returned to Memphis and sought psychiatric help. The doctor prescribed Prozac. After three weeks, he stopped taking the medication. During this time period, Wallace worked as a repossession specialist. Wallace was fired from this job and he blamed the Satanic cult and Mafia in Key West for interfering with his means of employment. In March 1997, Wallace returned to work at Rum Runners as a doorman. He was eventually laid-off. One month later, the shooting incident occurred.
On cross-examination, Wallace testified that during his employment at the psychiatric hospital, he worked with delusional patients. He stated that he knew how to fake mental illness. Wallace affirmed that he had researched and studied the insanity defense in the prison's law library. He acknowledged that he knew that murder was illegal and that he knew the nature and consequences of his shooting rampage. Wallace also stated that he was intending to defend himself from the Satanic cult and organized crime present in the bar. He believed that his actions were justified because he was acting in self-defense. However, Wallace acknowledges that while he was shooting the victims in the bar, he did not see anyone else with a weapon. The defense rested.
Thereafter, the state put on its rebuttal case and called three witnesses. First, the state called Kevin Squyres who had worked with Wallace at Rum Runners. Squyres testified that while they were both incarcerated, Wallace said that he knew what to say to be found not guilty by reason of insanity because he had a BA degree in psychology. Squyres stated that he came forward with this information, after his release, because he did not want Wallace to go free by using the insanity defense.
The state next called Dr. Marshall Wolfe, an unlicensed psychologist, who testified that Wallace was sane at the time of the shooting. Although Wolfe agreed with Drs. Marcovici and Hibberd that Wallace suffered from a delusional disorder, Dr. Wolfe opined that Wallace was exaggerating his symptoms to influence the outcome of the trial. Dr. Wolfe conducted no evaluation to determine whether Wallace was insane by reason of hallucinations or delusions at the time of the shooting.
Finally, the state called Dr. John Spencer, a licensed psychologist, who testified that Wallace was sane at the time of the shooting. Dr. Spencer disagreed with the other three experts' diagnosis of delusional disorder. Dr. Spencer concluded that Wallace knew the nature and consequences of his actions at the time of the shooting, and that he knew that his actions at the time of the shooting were wrong.
The prosecutor further questioned Dr. Spencer as to whether Wallace was insane by reason of hallucinations or delusions at the time of the shooting and whether Wallace's actions met the legal definition of self-defense. The defense interposed an objection to this line of questioning. The motion was overruled, and Dr. Spencer proceeded to give his opinion that nothing in the materials that he had reviewed indicated *371 a basis for Wallace to have believed that there was an imminent threat of harm at the time of the shooting. The state then rested its rebuttal case and requested the court to instruct the jury on the law of justifiable use of deadly force (i.e. Self-defense). The court declined to do so.
During closing argument, the prosecutor argued, inter alia, without objection that Wallace had not established his defense of insanity by reason of hallucinations or delusions because there was no threat of imminent harm to him under his delusions to support a theory of self-defense. Specifically, the prosecutor argued that the law of self-defense did not permit Wallace to go home and then return to the bar, rather, the law of self-defense required Wallace to just leave the bar.
The defense argued during its closing that Wallace believed his life to be in danger and that he did not know what he was doing was wrong because he honestly believed that he was acting in self-defense. In rebuttal, the state argued, again without objection, that the law of self-defense did not relieve Wallace of responsibility under his delusion, noting that Wallace had stated that the victims had looked like sheep lined up for him.
Based upon this evidence, Wallace now argues on appeal that the state improperly misled the jury as to his insanity defense when it interjected the law of self-defense throughout its questioning of Drs. Hibberd and Spencer and during its closing argument. That is, Wallace asserts that the prosecutor erroneously gave the jury the impression that it was only required to accept as true the facts on which Wallace based his belief that he was in imminent danger, but was not required to accept as true Wallace's actual belief that he was in imminent danger. By allowing the prosecutor to convey this impression, Wallace argues that the trial court committed prejudicial error. We disagree.
We initially note that Wallace does not appear to challenge the jury's rejection of his insanity defense under M'Naghten, only its rejection of his insanity defense by hallucinations or delusions. Further, we note that any challenge to the prosecutor's closing argument were not preserved for our review where no objection to the same was registered and they did not otherwise constitute fundamental error. See Walker v. State, 707 So.2d 300, 314 n. 8 (Fla.1997); Spencer v. State, 645 So.2d 377, 383 (Fla.1994). See also, e.g. Murphy v. Internat'l Robotics Systems, Inc., 710 So.2d 587, 589 (Fla. 4th DCA), rev. granted 722 So.2d 193 (Fla.1998). We are thus left to review the state's questioning of Dr. Hibberd and Dr. Spencer.
We find no error in allowing the state to elicit evidence from these witnesses as to whether there was a reasonable basis for Wallace's acts, even where Wallace's delusions are accepted as true or real. Wallace's argument on appeal simply ignores the fact that he could only be found not guilty under the hallucination theory if his acts would have been lawful had his hallucinations or delusions been the actual facts. Thus, the state correctly posits that Wallace would only be entitled to use deadly force if, under his delusions, he reasonably believed that the victims were about to inflict imminent bodily harm upon him. See Weiand v. State, 732 So.2d 1044 (Fla.1999); § 776.012, Fla. Stat. (1997). We therefore find no reversible error in permitting the state to elicit information from these witnesses as to whether, even under Wallace's delusions or hallucinations, Wallace was in imminent danger or harm to justify his use of deadly force. Given Wallace's own statements that the victims were lined up like a herd of sheep for him prior to the shooting, the jury could have properly rejected his use of deadly force under these circumstances.

II. The Hearsay Issue
Wallace next maintains that the trial court erred in excluding evidence on hearsay grounds, that went to Wallace's state of mind. Specifically, while testifying at trial, Wallace attempted to describe *372 an incident which took place at Rum Runners in February 1994. Wallace testified that the boyfriend of one of the dancers at the bar told him, "we're Satanists." The prosecutor objected to this testimony on hearsay grounds and the objection was sustained. Wallace then described paintings that he believed were Satanic symbols, which hung in the bar. Thereafter, when Wallace attempted to testify about statements which he overheard the bar employees making about him, the prosecutor again objected on hearsay grounds and the objection was again sustained. Wallace subsequently testified that he worked at the bar with an individual who said that Rum Runners was connected with the Boston Mafia. This testimony was again objected to on hearsay grounds and the objection was again sustained.
Wallace argues that the trial court erred in repeatedly excluding, on hearsay grounds, his testimony concerning these statements made to him because this testimony was not offered to prove the truth of the matters asserted, but instead was offered as to his state of mind. We agree, but conclude that this error was harmless because the excluded testimony was cumulative of other evidence presented to the jury.[3]
Here, the state pointed to many witnesses, who testified that Wallace told them that people at the bar were evil, part of the Mafia, and Satanists. Moreover, Wallace's own testimony set forth many of the same basic facts. He testified that a Satanic cult with ties to the Mafia in Key West was following him and that the Boston Mafia operated the bar. Wallace further testified that a woman who bit his neck at the bar was a Satanic vampire. Finally, Wallace stated that he needed to defend himself from the Satanistic cults and organized crime. Similarly, the defendant stated in a taped audio confession that the people at the bar were evil and Satanists, and that two of the individuals were vampires.
All of the evidence that Wallace argues was excluded, was put forth to the jury, in some form, at various stages of the trial. Thus, any error was harmless. See Goodwin v. State, 751 So.2d 537 (Fla.1999); DiGuilio, supra. See also Hansen v. State, 585 So.2d 1056 (Fla. 1st DCA 1991)(erroneous exclusion of the defense witness' testimony regarding her impressions of the murder defendant's mental condition was harmless in light of other testimony by witnesses and medical experts concerning the defendant's mental condition).

III. The Bystander/Attempted First Degree Murder Issue
As his last issue on appeal, Wallace argues that his conviction for the attempted first degree murder of Kristin Hutchins, a bystander who entered the bar during his shooting spree, must be reduced to attempted second degree murder because there was no evidence to suggest that he had the requisite intent to kill or hurt Hutchins. We disagree.
Although the state presented this count to the jury on a transferred intent theory, without objection from Wallace[4], we conclude that the evidence adduced by the state was more than sufficient to support Wallace's conviction for attempted first degree murder. Hence, there was no *373 need for the jury to rely upon the doctrine of transferred intent.
The relevant evidence, which went undisputed, was that Wallace fired six or seven shots into an area where several people were congregated and where Hutchins went upon her arrival at the bar. Additionally, one of the state's witnesses to the shooting, Clinton Relick, testified that Wallace began shooting down the length of the bar. Officer Winterbottom testified that Wallace stated after the shooting that he was carrying 100 rounds of ammunition, that he was glad about the shooting, and that he had specific targets at the bar. Still another state witness, Lazaro Valdes, testified that Wallace told him after the shooting that had it not been for that "m_____f" behind the door, at least 20 more "m_____f" would have been killed.
Before a defendant may be found guilty of attempted first degree premeditated murder the state must prove the following three elements beyond a reasonable doubt:
1. (Defendant) did some act intended to cause the death of (victim) that went beyond just thinking or talking about it.
2. (Defendant) acted with a premeditated design to kill (victim).
3. The act would have resulted in the death of (victim) except that someone prevented (defendant) from killing (victim) or [he][she] failed to do so.
See Florida Standard Jury Instructions in Criminal Cases, p. 85; § 782.04(1)(a), Fla. Stat. (1997). See also Sutton v. State, 718 So.2d 215 (Fla. 1st DCA 1998). Given the evidence adduced in this case, we think that a jury could reasonably have convicted Wallace of attempted first degree murder of Hutchins. We therefore affirm his conviction and sentence on this count.
Thus, for all of the foregoing reasons, we affirm the appellants convictions and sentences.
Affirmed.
NOTES
[1] The additional facts relevant to each of the individual issues on appeal, will subsequently be discussed herein.
[2] If a defendant presents evidence sufficient to present a reasonable doubt about sanity, this presumption of sanity disappears and the burden shifts to the state to prove, beyond a reasonable doubt, the accused's sanity. See Yohn v. State, 476 So.2d 123 (Fla.1985).
[3] The harmless error test places the burden on the state to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict. State v. DiGuilio, 491 So.2d 1129 (Fla.1986)(application of a harmless error test requires examination of the entire record by appellate court, including close examination of permissible evidence on which the jury could have legitimately relied, and in addition, even closer examination of impermissible evidence that might have possibly influenced the jury verdict).
[4] Therefore, we conclude that any appellate argument now raised by Wallace as to this transferred intent theory has not been preserved for our appellate review. See Fla. R.Crim. P. 3.390(d). See also Irving v. State, 627 So.2d 92, 94 (Fla. 3d DCA 1993); Scott v. State, 396 So.2d 271 (Fla. 3d DCA 1981).