143 So.2d 528 (1962)
Virginia M. PERRY, Appellant,
v.
STATE of Florida, Appellee.
No. 2934.
District Court of Appeal of Florida. Second District.
July 20, 1962.
Rehearing Denied August 16, 1962.
Elting L. Storms, Melbourne, for appellant.
Richard W. Ervin, Atty. Gen., Robert R. Crittenden, Asst. Atty. Gen., Lakeland, for appellee.
WHITE, Judge.
Appellant Virginia M. Perry, defendant below, was convicted on a charge of murder in the second degree to which she had pleaded not guilty and not guilty by reason of insanity. The fact of homicide by means of an automatic pistol discharged by the defendant was not disputed. It occurred about 2:30 in the afternoon of August 27, 1961 at an archery range in Eau Gallie, Florida, where the deceased, James Q. Butler, was competing in an archery tournament.
The defendant, a widow, met the deceased in April 1959 and they associated intimately for approximately two years *529 prior to the fatal shooting. The deceased had been married and divorced, and either shortly before or during his association with the defendant he was again married and divorced. He and the defendant were never married to each other. It is clear from the evidence that the relationship between defendant and deceased was essentially meretricious and accompanied by the turbulence that usually characterizes such relationships. Most of the history of this period was related by the defendant in her testimony as hereinafter reviewed.
The twelve assignments of error and five points on appeal relate largely to the court's charge to the jury and denial of defendant's motion for a new trial by which it was contended that the State had failed to adduce evidence to rebut defendant's prima facie showing of insanity at the time of the homicide. Most of these assignments are repetitious or plainly devoid of merit. We therefore shall confine our consideration to the few assignments and relevant points on appeal which urge in substance that the verdict of the jury was contrary to the evidence in that the defendant was shown to have been so mentally deranged that she was not criminally responsible for her act; or, in other words, that the evidence as a whole, as a matter of law, raised a reasonable doubt as to the defendant's criminal responsibility.
The defendant testified that shortly after she started going with the deceased she learned that he had married again. She thereupon attempted suicide by walking into the ocean, but some man pulled her out. She resumed going with the deceased and went with him continuously, the deceased having been then divorced from his second wife. She stated that they planned to get married after the completion of a house they were building on a lot owned by the deceased.
The defendant further testified that in January 1960 she thought she was pregnant. She and the deceased planned at first to get married in February, but one day he forced her to drink a mixture containing kerosene and turpentine to effect an abortion. After that they would "break up and fight and go right back together." On cross examination she stated she could not prove that she was pregnant as she did not go to a doctor.
During the last months of their association the deceased, according to the defendant, was not dependable in keeping dates. The defendant lost weight and was unable to eat, and this bothered the deceased. On August 13, 1961, two weeks before the shooting, she told him she couldn't take any more and was losing her mind and he "just laughed."
In the early afternoon of the fateful August 27th the defendant went to the archery range to take a bow to a little boy. She had a partly loaded gun or pistol which she always carried with her because, she said, the deceased gave it to her and wanted her to carry it. The deceased was at the range and he said to her "Good morning, Sport, how are you?" When she replied "All right" he laughed and said "Well, I will just have to see what I can do about that." Defendant then drove to the house they had built where she saw the furniture disarranged, a rumpled bed on which was a note she thought was from another woman the defendant had been staying with but she wasn't sure. She saw whiskey bottles and unwashed dishes and a jeweled hair comb which did not belong to her or to the deceased's mother who had previously stayed there while on a visit.
Defendant testified that she then became nervous and "shaking." She completed loading the pistol and attempted to burn the house by setting fire to a sheet. "Why I set the house on fire I guess was just to get rid of it. That and him and me * *" Further 
"Q [on cross examination] Then isn't it true that when you set fire to that house and you rushed out to that range you had two things in mind, *530 three things in mind, one to destroy the home that you built, of destroying him, and destroying yourself, that was your intent, was it not?
"A Yes, sir.
"Q And you carried out that intent with this little pistol?
"A Yes, sir."
The defendant then drove back to the archery range. Other testimony showed that she walked over to the deceased and shot him eight times in rapid succession. She did not attempt to leave but stared motionless and then temporarily passed out.
A court-appointed psychiatrist, Roger E. Phillips, M.D. believed as a result of his examination of the defendant that at the instant the defendant shot the deceased she was afflicted with a mental derangement known as conversion hysteria reaction. He described this condition as not a major mental illness, not a psychosis, but a state of mind in which conflicts are converted into behavior or symptoms not under the conscious control of the individual. He elaborated by saying that the conversion hysteria of the defendant was probably produced by steadily increasing frustrations in the relationship which had developed between her and the deceased. He further testified, however, that the defendant's attitude and reaction at the instant of the shooting was not incompatible with a plan, previously conceived by her at the house, to destroy the house, the deceased and herself. After being asked whether the defendant's decision to destroy the house by fire and to kill the deceased and then herself "came from a mind that had planned an act," Dr. Phillips replied that "it would appear that way, yes sir." The witness further testified that anger could have the same effect upon a person as conversion hysteria dissociation.
A number of witnesses on the range at the time of the fatal shooting testified that the defendant had a wild-eyed and unnatural appearance, and several of them stated they did not believe she knew what she was doing at that time. Most of these witnesses were not well acquainted with the defendant and they testified primarily from their immediate observation. Both the defendant and her brother testified that the defendant had suffered a fainting spell in 1959. Her brother had been worried about the extreme nervousness she had displayed following the death of her husband in 1958. However, there was no appreciable history of neurosis, psychosis or psychiatric treatment. In this situation it is the State's position that the defendant's appearance of irresponsibility at the time of the shooting was susceptible to evaluation modifying its apparent probative effect in the light of the established facts; that the jury could well have found that the defendant's act was the calculated result of anger and desire for revenge.
All persons are initially presumed to be sane. So a defendant has the burden of establishing his plea of insanity by demonstrating that he was legally insane at the time the alleged criminal act was committed. See Evans v. State, Fla.App. 1962, 140 So.2d 348, quoted infra; also Johnson v. State, 1909, 57 Fla. 18, 49 So. 40. It is established as an elementary proposition of law that a person who is precluded by mental disease from knowledge of what he is doing, or who knows what he is doing but does not know that the act is wrong, is not criminally responsible for the act. This is the import of the so-called M'Naghten rule. Armstrong v. State, 1892, 30 Fla. 170, 11 So. 618, 625, 17 L.R.A. 484. Mental aberrations, however, such as "irresistible impulse" and "emotional" or "moral" insanity are not recognized in Florida as justification or excuse for a criminal act. Hamilton v. State, Fla.App. 1959, 109 So.2d 422, 425. Warren on Homicide (Perm. Ed.) Vol. 1, § 61, pp. 190-193 states as follows:
"* * * (T)he incapacity to distinguish between right and wrong must exist at the time of the act. Temporary *531 mental incapacity or acute alcoholism does not generally excuse a homicide. Mere Temporary mania, or intermittent insanity, is no excuse or justification unless the accused was suffering therefrom at the time of the killing to such an extent as to be incapable of judging the quality of the act. A person who is mentally abnormal or is suffering from nervous disorder, is responsible for homicide. Anger may vitiate prudence; yet it does not constitute insanity. Sanity [sic] must be caused by mental disease. If the defendant has the capacity of distinguishing between right and wrong as to the particular act at the time of the killing, mere emotional insanity or passion or frenzy produced by anger, jealousy or other passion will not excuse him; nor can he discharge himself from responsibility for the homicide by showing that he did the act under the influence of an irresistible impulse. If a person had the capacity of distinguishing between right and wrong, as to a particular act, at the time he does it, moral insanity will not excuse." (Emphasis added)
In Evans v. State, Fla.App. 1962, 140 So.2d 348, Judge Kanner, speaking for this court said:
"It has long been recognized that sanity is the normal condition of man and that, when charged with a crime, he is presumed to be sane; the mere fact that he has committed a crime is not in itself sufficient to overcome the presumption. Davis v. State, 1902, 44 Fla. 32, 32 So. 822. Thus, in a prosecution for homicide, the defendant has the burden of establishing his plea of insanity by demonstrating that he was legally insane at the time the homicide was committed. McVeigh v. State, Fla. 1954, 73 So.2d 694. The State of Florida has long adhered to the `right and wrong' test for the determination of the sanity of a criminal defendant; the test is also referred to as the M'Naghten Rule. See Piccott v. State, Fla. 1959, 116 So.2d 626; Davis v. State, supra. This jurisdiction does nor recognize that phase of insanity denominated under the title of `irresistible impulse' or `moral insanity' as a defense to a criminal prosecution. The only issue presented under the defense of legal insanity is whether the accused, at the time of the unlawful act alleged to have been committed by him, had a sufficient degree of reason to know that he was doing an act that was wrong. Griffin v. State, Fla.App. 1957, 96 So.2d 424; Brock v. State, Fla. 1954, 69 So.2d 344; Crews v. State, 1940, 143 Fla. 263, 196 So. 590."
Thus, regardless of the fact that a person may entertain a morbid passion sufficient to unsettle the physical and moral system, yet if his mental faculties remaining are such that he can distinguish between right and wrong at the time of the act and the consequences thereof, he is legally responsible. State v. Eisenstein, Ariz. 1951, 72 Ariz. 320, 235 P.2d 1011; Evans v. State, supra.
Inability to discriminate between right and wrong is best ascertained not by the opinion of any medical witness nor by any medical theory but by the acts of the individual himself. 2 Wharton's Criminal Evidence (12th ed.) § 532 p. 379. Allowing one's passions to run until they become uncontrollable is not indicative of inability to distinguish between right and wrong or incapacity to form a criminal intent. See People v. Durfee, 1886, 62 Mich. 487, 29 N.W. 109; 22 C.J.S. Criminal Law § 56. Taking into account this defendant's own testimony and the testimony of others concerning her conduct, we think the jury could well have found that the evidence on the issue of insanity was insufficient to raise a reasonable doubt. When it appears that as reasonable men the jury could have found such a verdict from the evidence, it is the duty of this court to uphold the verdict and judgment. *532 Brock v. State, Fla. 1954, 69 So.2d 344, 346; Acree v. State, 1943, 153 Fla. 561, 15 So.2d 262.
There appearing no prejudicial error, it follows that the judgment appealed should remain undisturbed.
Affirmed.
SHANNON, C.J., and KANNER, J., concur.