178 So.2d 886 (1965)
James Robert BYRD, Appellant,
v.
STATE of Florida, Appellee.
No. 5585.
District Court of Appeal of Florida. Second District.
September 24, 1965.
Rehearing Denied October 19, 1965.
*887 David A. Davis, Bushnell, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and Robert G. Stokes, Asst. Atty. Gen., Lakeland, for appellee.
KANNER, Judge (Ret.).
An information filed against defendant-appellant, James Robert Byrd, charged that on May 13, 1961, he committed an assault with intent to commit murder in the first degree. Under his defense of not guilty by reason of insanity, he was by the jury found guilty as charged.
After examination of defendant by two court appointed physicians pursuant to motion of his counsel, Byrd, by order of August 4, 1961, was adjudged insane and was committed to the state hospital at Chattahoochee. On May 4, 1964, upon notification by state hospital authorities that defendant was then found to be mentally competent, the court ordered his return and appointed to examine him the same psychiatric specialists who had originally examined him. Their findings were in accord with the opinion of the hospital authorities, and the trial was had on August 31, 1964.
It was stipulated that defendant committed the assault, leaving the single question of his legal sanity. Testifying at the trial were only three witnesses, the two physicians above mentioned, who testified for the defendant, and one Leland Thompson, an eyewitness called by the state in rebuttal.
Both expert witnesses testified that they first examined Byrd for about one hour on July 25, 1961, in the Hillsborough County jail and had never before seen him, that defendant in their opinions was psychotic at the time of the examination, afflicted with schizophrenic reaction, paranoid type, that this condition had existed on May 13, 1961, the date of the assault. As to the nature of the examination conducted, each testified that it was the usual type of psychiatric examination based upon questions and answers and upon observation of the patient's appearance, actions, and reactions; one made no physical examination, while the other did not recall but had no record of having done so. Both doctors said in effect that schizophrenic reaction is characterized by remissions and that during remissions one afflicted with the illness is able to distinguish right from wrong.
With respect to observations of defendant's appearance, manner of speaking, and condition at time of the examination, the doctors described Byrd, variously, as disheveled, as having been depressed, with his thinking disorganized and with ideas that people disliked him. He had stated that he felt people were talking about him and calling him crazy, that he wished he could die and had the urge to kill himself for fear he might hurt other people.
One doctor stated that Byrd's condition had probably deteriorated considerably during the two months prior to the examination; however, he very much doubted the probability that defendant could have been in remission on May 13, 1961. The other doctor said that the greater the stress one is put under, the faster he would deteriorate, that it could be overnight or within a month or six months. Upon query, the witness said it could be probable that defendant could have been in a period of remission two months prior to the examination and further acknowledged that a person in remission is capable of committing an act of violence, knowing what he is doing. Each doctor maintained that in his opinion Byrd was mentally ill on May 13, 1961, the time of the assault, was not in remission, and could not distinguish right from wrong.
The lay witness, Thompson, then chief deputy and sheriff-elect of Pasco County, testified that he had attended eight or ten *888 competency hearings in connection with his duties and had also had occasion quite a bit to observe persons who were incarcerated in the county jail, to interview defendants, and to be in contact with them. He said he knew the defendant; and, from the testimony which he gave, the two conversed on a first name basis during the course of events which emerged through that witness's narrative. The assault took place at the county jail as defendant attempted to escape from custody prior to his being incarcerated under a pre-existing warrant for his arrest. Thompson gave full details of defendant's detention at a certain bar, his escorting of defendant from there to the county jail, their discussion of procuring a bondsman and inability to locate one, Thompson's expressed intent to search defendant preparatory to locking him up, defendant's attempted escape and his assault, the subduing of defendant and his imprisonment, and a conversation had by Thompson with Byrd in his jail cell shortly afterward. Thompson related that he observed nothing unusual either before or after the episode involving the assault but indicated to the contrary with respect to defendant's actions, demeanor, and tone of voice. For example, during the trip from the bar to the jail prior to the assault, defendant came willingly; he and Thompson chatted enroute about fishing; Byrd told the officer he desired to go fishing that evening; and the two discussed the matter of getting a bondsman; in the cell of defendant following the assault, there was nothing unusual, but Byrd spoke in a normal tone of voice and, near the close of the conversation, said he was sorry. Following Thompson's detailed testimony, all based upon his personal knowledge, that witness gave as his opinion as a layman that Byrd was sane.
The position of Byrd on the appeal is that he proved he was legally insane at the time he committed the offense charged or raised a reasonable doubt as to his sanity which the state failed to overcome. The question or issue, therefore, is whether defendant knew right from wrong at the time of commission of the offense.
Sanity being the normal condition of man, a presumption that he is sane exists when he is charged with a crime; and the fact that he has committed a crime is not sufficient, standing alone, to overcome this presumption. Davis v. State, 1902, 44 Fla. 32, 32 So. 822: Evans v. State, Fla.App. 1962, 140 So.2d 348. The burden thus devolves upon one charged with a crime to establish his plea of insanity by showing that he was legally insane at the time of the commission of the act. McVeigh v. State, Fla. 1954, 73 So.2d 694, appeal dismissed 348 U.S. 885, 99 L.Ed. 696, 75 S.Ct. 210; Camp v. State, Fla.App. 1963, 149 So.2d 367. However, when there is testimony of insanity sufficient to present a reasonable doubt of sanity, the presumption vanishes and the defendant is then entitled to an acquittal if the state does not overcome the reasonable doubt. Farrell v. State, Fla. 1957, 101 So.2d 130.
For determination of the sanity of a criminal defendant, Florida long has adhered to the "right and wrong" test, known also as the M'Naghten Rule. Piccott v. State, Fla. 1959, 116 So.2d 626; Davis v. State, supra; Evans v. State, supra. In application of this test, the only issue presented is whether the accused, at the time of the unlawful act alleged to have been committed by him, had a sufficient degree of reason to know that he was doing an act that was wrong. Brock v. State, Fla. 1954, 69 So.2d 344; Camp v. State, supra.
In Florida, the doctrine of "irresistible impulse" or "moral insanity" is not recognized. Cochran v. State, 1913, *889 65 Fla. 91, 61 So. 187; Perry v. State, Fla.App. 1962, 143 So.2d 528. Nor is subnormal mentality a defense, unless the accused by reason of it was unable to distinguish between right and wrong with regard to the act in question. 9 Fla.Jur., section 173, Insanity, page 201.
Here, the medical witnesses who testified had spent one hour examining defendant through the question and answer and observation method at the county jail more than two months after the date of the assault. Although it was their opinion that at the time of the deed in question defendant was insane, there was the testimony that it could be probable he was in remission on that date and that, when in remission, a person afflicted with schizophrenic reaction is capable of committing an act of violence with knowledge of what he is doing; further, that the deterioration of defendant's condition during the two months following the assault had probably been considerable. As against this, Thompson, the only eyewitness, who knew Byrd on a first name basis and whose observation of him was within the actual framework of events leading up to, during, and subsequent to the assault, rendered a detailed narrative of what took place and what Byrd did and said, following which he expressed the opinion, as a layman, that Byrd was sane. Cf. Norman v. State, Fla.App. 1963, 156 So.2d 186.
Under the evidence, the issue of defendant's sanity was within the province of the jury to determine under appropriate instructions, which the court gave. There is no reason to upset the result of the jury's deliberation.
Affirmed.
SHANNON, Acting C.J., and SMITH, J., concur.