664 So.2d 276 (1995)
Iris Smith CONGLETON, as guardian of Coleman C. Smith, Appellant,
v.
Elaine SANSOM, as personal representative of the Estate of Vera I. Smith, deceased, Appellee.
No. 95-297.
District Court of Appeal of Florida, First District.
November 16, 1995.
Rehearing Denied December 20, 1995.
*277 Gordon Steven Dow, Tallahassee, for Appellant.
Larry A. Bodiford of Hutto and Bodiford, Panama City, for Appellee.
BENTON, Judge.
As guardian of Coleman C. Smith, Iris Smith Congleton appeals a final judgment excluding her ward as a beneficiary of the estate of Vera I. Smith, whose death left Mr. Smith a widower. The judgment invokes section 732.802, Florida Statutes (1991), the so-called "slayer statute," which renders a person who unlawfully and intentionally kills another person ineligible to receive property on account of the death. The guardian argues for reversal on grounds, inter alia, that the circuit court erred in applying the slayer statute to Mr. Smith because he was never actually placed in jeopardy at a criminal trial; that the supposed fact of Mr. Smith's insanity makes the slayer statute inapplicable as a matter of law; that the trial court erred in relying on Prasad v. Allstate Insurance Co., *278 644 So.2d 992 (Fla. 1994) in concluding otherwise; that the killing was a legal accident outside the slayer statute's purview; and that Mrs. Smith's personal representative failed to meet her burden to show that Mr. Smith unlawfully and intentionally killed Mrs. Smith. We affirm.
On the morning of July 29, 1992, Mr. Smith strangled his wife. He called 911 shortly afterwards to report the fact. The police found him alone with the corpse, took him into custody, and sent him for a "Baker Act evaluation," all within about half an hour. Charged with second degree murder, Mr. Smith filed a motion to dismiss under Florida Rule of Criminal Procedure 3.190(c)(4) on the ground that the undisputed facts did not establish a prima facie case of guilt. On May 27, 1993, he was adjudicated not guilty by reason of insanity, never having gone to trial.
In a separate proceeding, the personal representative of Mrs. Smith's estate filed a petition to determine the beneficiaries of her estate. At an evidentiary hearing or bench trial on the petition, Officer Dennis Kiah of the Lynn Haven Police Department testified that Mr. Smith made several statements indicating that he remembered choking his wife to death.[1] The 911 tape also came into evidence.[2] Expert testimony was adduced to *279 the unanimous effect that Mr. Smith was probably legally insane[3] at the time of the killing. After hearing the testimony, the trial court entered the order now on appeal.

Conviction Unnecessary
We find no merit in the guardian's contention that the circuit court could not apply the slayer statute in a probate proceeding because Mr. Smith was never tried criminally. Although a predecessor statute did require conviction for disqualification, see Hill v. Morris, 85 So.2d 847 (Fla. 1956), since enactment of chapter 82-71, at 186, Laws of Florida (1982) on April 2, 1982, section 732.802(5), Florida Statutes, has provided:
A final judgment of conviction of murder in any degree is conclusive for purposes of this section. In the absence of a conviction of murder in any degree, the court may determine by the greater weight of the evidence whether the killing was unlawful and intentional for purposes of this section.
(Emphasis added.) The current statute plainly contemplates the "absence of a conviction of murder," and authorizes a court, in that event, to proceed independently, as the court did here, to "determine by the greater weight of the evidence whether the killing was unlawful and intentional." § 732.802(5), Fla. Stat. (1991).
Unless criminal proceedings eventuate in a murder conviction, a judgment in the criminal case is not determinative for purposes of the slayer statute. In re Estate of Howard, 542 So.2d 395 (Fla. 1st DCA 1989) (acquitted defendant disqualified under slayer statute). Acquittal on charges that must be proven beyond a reasonable doubt does not foreclose proof that meets the lesser civil standard. See generally Starr Tyme, Inc. v. Cohen, 659 So.2d 1064 (Fla. 1995); Stogniew v. McQueen, 656 So.2d 917, 919 (Fla. 1995) (rejecting "contention that ... *280 there is no longer a requirement of mutuality for purposes of collateral estoppel"). A party invoking the slayer statute, also called the Murder Probate Statute, to prevent an unconvicted killer's acquisition of property has the burden of proving that the killing was both intentional and unlawful. Howard. Cf. Carter v. Carter, 88 So.2d 153, 159 (Fla. 1956) ("The burden of proof in the first instance will rest on the party who alleges that the killing was intentional and unlawful.").
[I]f at the trial a preponderance of the evidence should establish the fact that the homicide was intentional and unlawful in nature and therefore was without the purifying effect of excuse or justification, the ... [killer cannot take]. If, however, the evidence preponderates in favor of justification or excuse, an example of which would be self-defense, accident or insanity, then there would be no area for the application of the rule that would prevent [the killer's] recovery.
Carter, 88 So.2d at 159 (describing procedure to determine whether slayer was eligible to receive life insurance benefits). Accord Ford v. Ford, 307 Md. 105, 512 A.2d 389, 396 (Md. 1986) ("The protester would attempt to prove by a preponderance of the evidence that the claimant had killed the testator and that the homicide was felonious and intentional, so that under the slayer's rule the claimant would be excluded from the distribution of the estate. The claimant would defend against this by evidence refuting his guilt of felonious and intentional homicide or by establishing that, if he did commit it, at the time of its commission, he lacked the capacity to appreciate the criminality of his conduct... .").

Intentionally
Because an unintentional killing does not trigger the slayer statute's bar, the personal representative had to show that Mr. Smith acted intentionally. Although a felony, involuntary manslaughter does not require intent and so does not, under common law principles, disqualify the perpetrator from taking an interest in property devolving as a result. Beene v. Gibraltar Indus. Life Ins. Co., 116 Ind. App. 290, 63 N.E.2d 299, 300 (1945); Commercial Travelers Mut. Accident Ass'n v. Witte, 406 S.W.2d 145, 149 (Ky. 1966). Accord Huff v. Union Fidelity Life Ins. Co., 14 Ohio App.3d 135, 14 OBR 151, 470 N.E.2d 236, 239 (1984); State ex rel. Miller v. Sencindiver, 166 W. Va. 355, 275 S.E.2d 10 (1980). Accidental killings may be excusable. § 782.03, Fla. Stat. (1993). On the other hand, an individual exonerated from criminal liability may nevertheless be found to have intended to cause a death.
Last year's decision in Prasad v. Allstate Insurance Co., 644 So.2d 992 (Fla. 1994), which the trial court cited in the order under review, made clear that acquittal by reason of insanity did not require a particular result on the question of intent in parallel civil proceedings:
We note the apparent inconsistencies of finding that an individual intended a crime for purposes of this type of civil insurance claim but allowing that person to escape criminal liability by reason of insanity. That inconsistency, however, was appropriately addressed by the Virginia Supreme Court in Johnson [v. Insurance Co. of N. Am., 232 Va. 340, 350 S.E.2d 616 (1986)], where it stated:
On the surface, there appears to be a blatant inconsistency in concluding, as we do, that a person may be criminally insane when shooting another, and thus avoid full criminal sanctions, and yet that same individual can be denied insurance coverage because he "intended" to shoot his victim. A more careful analysis, however, will reveal there is no inconsistency at all.
In the law, there are many situations in which a person may intentionally injure or kill another and not be subject to criminal punishment. For example, an individual may kill in self-defense. The executioner may kill with the sanction of the State. A soldier may injure or kill under rules of combat. This conduct is intentional, but it is also excusable. Likewise, an individual may be excluded from penalty if he is insane at the time he commits a criminal act. As here, he may do the act with every intention of consummating it, but when it is shown *281 that he was mentally ill, he is excused from the imposition of the usual sanctions. "The absence of punishment, however, does not retrospectively expunge the original intention." Colonial Life & Accident Ins. Co. [v. Wagner,] 380 S.W.2d [224, 226 (Ky. 1964)].
350 S.E.2d at 620-21.
Id. at 995. While the supreme court decided in Prasad only that a liability insurance policy's exclusion for intentional injuries ruled out coverage for injuries intentionally inflicted by a psychotic insured, the implications for the present case are clear.
A "purpose of incorporating intentional injury exclusions into insurance policies is to preclude persons from benefiting financially when they cause injury... . Johnson v. Insurance Co. of N. Am., 232 Va. 340, 350 S.E.2d, 616, 619 (1986)," Prasad, 644 So.2d at 994, in keeping with the maxim: Nullus commodum capere potest de injuria sua propria. See Ashwood v. Patterson, 49 So.2d 848, 850 (Fla. 1951) ("`no one shall ... profit by ... his own wrong'"). This is also an apparent purpose of the slayer statute. The Prasad court concluded that
an injury inflicted by an insane person is intentional if the actor understands the physical nature and consequences of the act. This is true even if the actor is unable to distinguish right from wrong.
Prasad, 644 So.2d at 994. This view[4] is not universal. See, e.g., In re Estate of Vadlamudi, 183 N.J. Super. 342, 443 A.2d 1113, 1117 (Ct.Law Div. 1982) ("[T]his court holds that under [New Jersey's slayer statute] the perpetrator of a homicidal act committed while legally insane cannot be, as a matter of law, one `who intentionally kills' within the meaning of that section."); Simon v. Dibble, 380 S.W.2d 898, 899 (Tex. Ct. App.), writ refused, 8 Tex.Sup.Ct.J. 9 (1964). But it is the view in Florida. Prasad.
In the present case, the personal representative met her burden to show that Mr. Smith intentionally killed the decedent. The evidence would support findings that Mr. Smith was under no misapprehension about what he was doing when he choked his wife, and that he did not throttle her unintentionally. The trial court found:
On the issue of civil homicide as outlined in Florida Statute 732.802, the Florida Slayer statute, by the greater weight of the evidence, based upon the factual evidence submitted at the probate trial, including the testimony of the mental health professionals, Coleman C. Smith did unlawfully and intentionally kill his wife, Vera I. Smith.
The 911 call and Mr. Smith's statements to Officer Kiah and Ms. Parsons fully support the trial court's finding that Mr. Smith intended to kill Mrs. Smith.

Unlawfully
On the issue of unlawfulness, too, the burdened party, here the personal representative, must demonstrate by a preponderance of the evidence the slayer's lack of entitlement. Estate of Brumage v. Kivi, 460 So.2d 989, 990 (Fla. 4th DCA 1984) ("there should be a civil proceeding between the various protagonists to determine whether the person was sane or insane and the issue is to be proven by the preponderance of the evidence").
In most slayer statute cases as in most criminal prosecutions the question of insanity will not arise. The presumption in favor of sanity will carry the day. But where, as in the present case, evidence of insanity is adduced, a party seeking to prevent an unconvicted slayer's benefiting from his own wrongdoing must show that the slayer was not legally insane at the time of the slaying, in order to show that the slaying was unlawful or felonious.
*282 The trial court did not explicitly rule on the contention that Mr. Smith was legally insane when he killed his wife, as counsel for the guardian pointed out in his motion for rehearing (or amendment) of the final judgment. But the "test ... is whether the judgment of the trial court is supported by competent evidence." Shaw v. Shaw, 334 So.2d 13, 16 (Fla. 1976). In finding that Mr. Smith acted unlawfully, the trial court implicitly found that the weight of the evidence established that he was not legally insane[5] when he killed his wife. See Cave v. State, 661 So.2d 1213, 1214 (Fla. 1995) (reviewing court "correct in examining the record to determine if the requisite [facts] existed notwithstanding the failure of the trial court to make the precise finding").
In a Florida criminal proceeding, acquittal by reason of insanity is appropriate, even though the criminal defendant intended the act charged, if reasonable doubt exists either as to his mental ability to have distinguished between right and wrong at the time, or as to whether "the defendant was by reason of mental infirmity, disease, or defect unable to understand the nature and quality of his act or its consequences," Hall v. State, 568 So.2d 882, 885 (Fla. 1990); Campbell v. State, 227 So.2d 873 (Fla. 1969), cert. denied, 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33 (1970) (challenge to Florida's adherence to rule in M'Naghten's case rejected); Hodge v. State, 26 Fla. 11, 7 So. 593 (1890) (standard is reasonable doubt), and acted for that reason. While it has been said that "in order to constitute the crime of murder, the slayer must have a responsible and sane mind," Davis v. State, 44 Fla. 32, 50, 32 So. 822, 827 (1902), the same early opinion approved the narrower formulation in the following jury instruction:
The true test of criminal responsibility, when the defense of insanity is interposed, is whether the accused had sufficient use of his reason to understand the nature and consequences of the act with which he is charged, and to understand that it was wrong for him to commit it; that, if this was the fact, he was criminally responsible for it, whatever peculiarity may be shown about him in other respects. Whereas, if his reason was so defective, in consequence of mental disorder, that he could not understand what he was doing, or that what he was doing was wrong, he ought to be treated as an irresponsible person, and acquitted.
The question of criminal responsibility is a legal question dependent on facts not exclusively within the province of psychology, psychiatry or any other technical, non-legal realm.[6] Whether or not the "meaning of `unlawfully' has yet to be defined by the Florida courts," State v. Mayle, 406 So.2d 108, 109 (Fla. 5th DCA 1981), review denied, 419 So.2d 1200 (Fla. 1982), in some broad general sense,[7] the decisions in Carter and in *283 the criminal insanity cases yield a definition of unlawfulness for purposes of the slayer statute.
The slayer statute would not operate to disinherit Mr. Smith, if the personal representative had been unable to show the trial court that he was not legally insane when he intentionally killed his wife. E.g., Carter; Hill; Turner v. Estate of Turner, 454 N.E.2d 1247, 1252 (Ind. Ct. App. 1983); Ford (reporting that all sixteen jurisdictions considering the question were in agreement); Anderson v. Grasberg, 247 Minn. 538, 78 N.W.2d 450, 461 (1956) ("We feel that the better rule to be applied to the case before us is that the slayer will not be barred from taking the property where his unlawful act was the product of mental disease."); In re Estate of Damario, 488 Pa. 434, 412 A.2d 842 (1980). The trial court's determination that Mr. Smith acted unlawfully as well as intentionally is determinative.
Both expert witnesses, it is true, answered affirmatively when asked, in effect, whether Mr. Smith was legally insane at the time of the uxoricide. The trial court was under no obligation to credit this testimony, however. See Garron v. State, 528 So.2d 353 (Fla. 1988); Rivers v. State, 458 So.2d 762, 765 (Fla. 1984) ("witness who is not a medical expert can testify about a person's mental condition ... based upon ... observation"); Shaw v. Puleo, 159 So.2d 641, 644 (Fla. 1964) (jury may "reject the expert testimony and rely on lay evidence"); Davis v. State, 44 Fla. 32, 41, 32 So. 822 (1902); Armstrong v. State, 30 Fla. 170, 200, 11 So. 618 (1892) (lay witnesses can relate "facts known to them which show insanity, and thereupon express an opinion as to sanity").
Dr. Warriner testified, "Yeah, that was my testimony in my letter," without meaningful elaboration. Dr. McClaren explained the basis for his opinion: He concluded that Mr. Smith was "confused, disoriented, probably paranoid, possibly hallucinating at the time ... [psychotic and] ... out of touch with consensual reality." Confusion, disorientation, paranoia, and psychosis are not incompatible with criminal responsibility. "[W]hatever peculiarity may be shown about him in other respects," Davis, 32 So. at 827, Mr. Smith acted unlawfully or feloniously unless his intentional act was the product of legal insanity.
Dr. McClaren also testified that Mr. Smith might have been hallucinating or "out of contact with ... reality," when he strangled Mrs. Smith. Aside from this expert testimony, the evidence strongly suggested otherwise. Moments after the event, Mr. Smith accurately reported what had transpired to the 911 operator. The evidence is very clear, moreover, that no hallucination or lack of contact with reality led him to believe that choking his wife to death was lawful. Assuming hallucinations, Mr. Smith acted lawfully only "[i]f the act ... would have been lawful had the hallucinations or delusions been the actual facts." Cruse v. State, 588 So.2d 983, 989 (Fla. 1991). Neither the *284 expert testimony nor any other evidence proved any inability to tell right from wrong. Mr. Smith told the 911 operator he was "sorry" for what he had done. He told Ms. Parsons that he felt "guilty" about it.
The "accuracy of the trial judge's conclusions on fact questions is tested by interpreting the evidence and all reasonable inferences capable of being drawn from them in the light most favorable to the trial court's conclusions." Peacock v. Melvin, 652 So.2d 951, 952 (Fla. 1st DCA 1995). Here the trial court's finding that Mr. Smith acted not only intentionally but also unlawfully has the requisite evidentiary support.
Affirmed.
MICKLE and VAN NORTWICK, JJ., concur.
NOTES
[1] Officer Kiah's investigative report was admitted into evidence, and revealed Smith's answers to questions asked by a Ms. Parsons at the emergency room.

Q. Would you tell the Court what were those questions that you personally heard Ms. Parsons ask and the answers to those questions that you recorded in your investigative file?
A. Okay. The first question asked by Ms. Parsons to Mr. Smith was, "Do you know why you're here?" At which time he replied to her, "Because I choked my wife to death." At this point she grabbed her chest, turned around to me and said, "Do I have to write that down?" And I told her, "I don't know. You're from Life Management." At this point she turned around and asked him how he felt right now, at which time he advised guilty.
Officer Kiah also testified concerning the statement he took from Mr. Smith.
A. "Do you remember exactly what happened when you started to choke your wife? Do you remember how you did it? Do you remember if you used your hands or do you remember how you did it?" He advised, "Yes, I do." Question, "Could you tell me how you did it?" "I was sitting on the side of the table there, over there, and she came out around, out from the kitchen somewhere or another and something just, it was not reason, okay." He made a motion with his hand, is that  no, I can't remember exactly what motion he made with his hand at that time. Then the question, "Something just snapped in you?" His answer, "I caught her around the neck." "Okay, did you do it with your arm, with both hands or do you remember that? Did you ever get on top of her?" "I don't know about that." "But you remember catching her around the neck?" "Yeah."
[2] On the 911 tape, Mr. Smith admitted to choking his wife, but denied that it was "on purpose."

OPERATOR-911: 911. What is your emergency?
CALLER: I just choked my wife to death.
OPERATOR-911: On purpose?
CALLER: Huh?
OPERATOR-911: On purpose?
CALLER: No, I went (inaudible), I went crazy.
OPERATOR-911: Let me switch you to the ambulance service, sir.
CALLER: Ma'am?
OPERATOR-911: Do you need the ambulance?
CALLER: Yeah.
OPERATOR-911: Just a moment.
(Ambulance service call)
OPERATOR-EMT: Go ahead, sir. Hello?
CALLER: Hello?
OPERATOR-EMT: Yes?
CALLER: I need a, an ambulance. Something went wrong with my mind, I just choked my wife to death.
OPERATOR-EMT: What?
CALLER: Ma'am?
OPERATOR-EMT: What did you do?
CALLER: I, yeah.
OPERATOR-EMT: What did you just, what's wrong?
CALLER: What's wrong?
OPERATOR-EMT: Yes, sir.
CALLER: All right. I need somebody to pick up my wife.
OPERATOR-EMT: What's wrong with her?
CALLER: Well, I, I choked her to death.
OPERATOR-EMT: You choked her?
CALLER: I'm sorry.
OPERATOR-EMT: Bay County, are you 
CALLER: Something went through my mind.
OPERATOR-EMT: Okay. We need [to] get someone to 1219 Tennessee?
CALLER: 1219 Tennessee Avenue.
OPERATOR-EMT: How long ago did this happen?
CALLER: Ma'am?
OPERATOR-EMT: How long ago did this happen?
CALLER: Well, this, it's been just a few minutes.
OPERATOR-EMT: Is she breathing?
CALLER: Huh?
OPERATOR-EMT: Is she breathing?
CALLER: I can't understand you.
OPERATOR-EMT: Is she breathing, is your wife breathing?
CALLER: I don't know.
OPERATOR-EMT: Okay. You're at 1219 Tennessee Avenue?
CALLER: Yeah.
OPERATOR-EMT: An ambulance is on the way.
CALLER: Okay, bye-bye.
[3] Dr. McClaren first examined Mr. Smith on September 10, 1992.

Q. Dr. McClaren, on the basis of all of these clinical observations, reviewing the records, the study of this case, you were involved in it in three separate stages, on that basis what is your professional opinion as to the most likely, within a reasonable degree of medical certainty, the most likely diagnosis of Mr. Smith on the day that he killed Vera Smith?
A. I believe that he had an organic mental disorder, I can't specify the type, that caused him to be confused, disoriented, probably paranoid, possibly hallucinating at the time. This is based on the known observations of him, interviews with some members of his family, descriptions by medical people that treated him after he was taken into custody, Lieutenant Kiah's observations, and also how he improved in the hospital after he got proper treatment.
Q. And I guess the bottom line is after having said that, was he psychotic or was he not?
A. In my opinion, he was.
Q. But I'm sure Mr. Bodiford could come up here and say, well, you know, what's psychotic, what does that mean? Can you tell us what would, how you would define someone that was psychotic?
A. I think the simplest way or the usual use of that term would be to be out of contact with consensual reality. There are many different kinds of symptoms of psychosis.
Q. Under the legal definition, and I believe as a qualified forensic expert I believe you would be familiar with it, under the legal definition of insanity, on July 29th, 1992, in your professional opinion, within a reasonable degree of medical probability, do you think Mr. Smith was legally insane at that time?
A. That's my best estimation, yes, sir.
Dr. Clell Warriner first examined Mr. Smith on August 1, 1992, after he was contacted by defense counsel in the criminal proceeding. Dr. Warriner testified as follows:
Q. And at the time, on  well, let me find, in your opinion, within a reasonable degree of medical probability, assuming Mr. Smith killed his wife on July 29th, 1992, in your professional opinion was Mr. Smith more likely than not legally insane, or just insane, at the time of the killing?
A. Yeah, that was my testimony in my letter, that it was my opinion that judging from his condition on that day that I saw him, that it was my opinion that at the time of the alleged killing that he was insane under the legal definition of insanity at the time of the killing.
[4] The Prasad court also concluded that an act may be intentional even if its consequences are not fully comprehended.

[A] person who is considered insane may still be capable of entertaining the intent to commit certain acts, even if that intent is the consequence of a delusion or affliction. For instance, an insane or mentally ill person can still make plans to harm another, going so far as to obtain the weapon to be used and to seek out the victim. By any stretch of the imagination, the person "intended" the act against the victim, even if the person did not fully understand what he or she was doing at the time of the crime.
Prasad, 644 So.2d at 995.
[5] The guardian maintains that the killing was a "legal accident" because Mr. Smith's purported insanity was sudden and unforeseeable, analogizing the claimed unforeseeability of his supposed insanity to the difficulty of "trying to foresee the first time a young dog will bite someone." But the trial court implicitly rejected any finding of insanity, sudden or otherwise.
[6] For another formulation of the legal test, see Cruse v. State, 588 So.2d 983 (Fla. 1991), cert. denied, 504 U.S. 976, 112 S.Ct. 2949, 119 L.Ed.2d 572 (1992). The court approved the following jury instruction:

A person is considered to be insane when: (1) he had a mental infirmity, disease, or defect; (2) because of this condition (a) he did not know what he was doing or its consequences, or (b) although he knew what he was doing and its consequences, he did not know it was wrong.
Cruse, 588 So.2d at 989 n. 4.
A person may be legally sane in accordance with the instructions previously given and still yet, by reason of mental infirmity, have hallucinations or delusions which cause him to honestly believe to be facts things which are not true or real. The guilt of a person suffering from such hallucinations or delusions is to be determined just as though the hallucinations or delusions were actual facts. If the act of the defendant would have been lawful had the hallucinations or delusions been the actual facts, the defendant is not guilty of the crime.
Id. at 989. Accord Boswell v. State, 610 So.2d 670 (Fla. 4th DCA 1992).
[7] On the question whether an act attributable to the actor's insanity may be unlawful, there is some confusion. "In application of ... [the M'Naghten Rule], the only issue presented is whether the accused, at the time of the unlawful act alleged to have been committed by him, had a sufficient degree of reason to know that he was doing an act that was wrong." Byrd v. State, 178 So.2d 886, 888 (Fla. 2d DCA 1965) (emphasis added), cert. denied, 188 So.2d 318 (Fla. 1966); see also 15 Fla.Jur.2d Criminal Law § 3059 (1993) ("In order to successfully assert the defense of insanity, the defendant must have been insane at the time that the unlawful act was committed... .").

In Carter v. Carter, 88 So.2d 153, 159 (Fla. 1956), Justice Thornal explicated common law principles on which the slayer statute was presumably subsequently modeled:
By the expression "feloniously killed" in this particular type of situation, we understand the Chancellor to have reference to an "unlawful and intentional" killing. As so construed, we find no objection to the use of the word "feloniously."
See also Hamilton v. Liberty Nat'l Life Ins. Co., 207 So.2d 472, 475 (Fla. 2d DCA), cert. denied, 212 So.2d 878 (Fla. 1968).
A defendant's insanity at the time of the offense precludes criminal liability, but a killing is not defined by statute as excusable homicide, simply because the perpetrator is insane.
Homicide is excusable when committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution, and without any unlawful intent, or by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner.
§ 782.03, Fla. Stat. (1993). The use of deadly force is not justifiable except by a person resisting an attempt "to commit any felony upon him or upon or in any dwelling house in which such person shall be." § 782.02, Fla. Stat. (1993).